# NEW YORK OYER AND TERMINER.

### JANUARY, 1847.

Before EDMONDS, Circuit Judge, and two aldermen.

## THE PEOPLE v. CALVIN RUSS.

Defense of insanity on a trial for murder.

The uncertainty and imperfections of the rule of law defining the offense as an exemption from legal responsibility.

Considerations that must weigh with the jury in passing on the question of insanity.

THE prisoner was indicted for murder.  He was native born, of about thirty-three years of age, a journeyman me-

chanic, of exemplary life, reserved in manner, but of an affectionate and sensitive nature.

He was working at his trade in Albany, where he had been a few weeks, and there he became acquainted, at his boarding-house, with a woman of about his own age, who was intro-duced to him as a widow. She was of a very mild, placable temper, and he was much struck with the gentleness of her character and deportment, and after a hazardously short acquaintance he married her.

The next morning after his marriage, while he was dressing, he found on her washstand a note in a man's handwriting, making an assignation with the person to whom it was ad-dressed. The address was missing, and though he did not deem it to have been intended for his wife, the fact lived in his memory.

He soon learned what a mistake he had made. He found that his wife was so addicted to the use of opium, that she could not get up in the morning without her dose of lauda-num, and her two glasses of gin; that she was careless, listless, and slatternly, taking no care of his things, or hers, not even keeping herself clean, and with her good nature and gentle-ness manifesting a total indifference to him or her duties to him. She was, moreover, extravagant, and ran him in debt, and would even go to his employers and take up his wages. He remonstrated with her and tried to persuade her to act differently. She would be distressed at his complaints, but seemed to be wanting in the energy necessary to enable her to exercise any self-control.

Out of this state of things grew up an alienation on her part toward him, and she would go off visiting and leave him for weeks, but his affection for her was so great, that he would induce her to return to him, but without any alteration in her life, so that, whether present or absent, she was a source of constant anxiety and trouble to him. So much so, that ere long his acquaintances began to discover strange and unusual conduct in him — occasional absent-mindedness and incohe-rency of thought.

The People v. Calvin Russ.

At length one of his fellow shop-men, to whom he was much attached, asked him what was the matter and what the trouble that weighed upon him? He replied that his wife had ruined him. His friend asked him if he had just found out who she was? All his friends had known it, and had wondered at his marrying her. Found out what? was his inquiry, for he was thinking of her habits, and had no suspicion of her want of chastity. His friend answered him; "found out that she was not a widow — that she had been for years the kept mistress of Lovell, the defaulting bank teller, whom she had ruined by her extravagance."

Subsequently he made farther discoveries. He found on her table another letter which went to show that she had been the mistress of another man, and she would go out evenings, spend the whole evening away from home, and refuse to tell him where she had been.

Gradually these discoveries produced their effect upon him.

The homicide was committed in September, 1846. During the previous summer his friend testified that he would frequently wring his hands and cry bitterly. He was very restless — would leave him abruptly in the street, and go around the corner and stand all alone; would not answer his friend at all, and sometimes his eyes would open wide, he would look wild, and start off. This occurred every night or two, in their walks together after their work was done. "He was altered so much that I did not recognize him; changed in his looks, his conduct, and his conversation. He had a very wild and glaring look; looking up and down. His dress was shabby. Before that, he had always been very neat and tidy. He said, 'how do you do, George?' I asked him who he was? He asked me if I didn't know him? and I said I didn't; he told me his name was 'Mr. Russ.' His eyes looked different from what I had ever seen before. He was emaciated. Had on an old blue cloth cap, and an old black coat and pants, a good deal the worse for wear, slip-shod shoes, with his toes all out. He was very restless, pacing backward and forward.

"I asked him where he had been? He said 'no-where;'

then he turned around and said he had been to Portland, Boston, and New York. He seemed anxious to avoid conversation. I asked him where his trunk was? He said he hadn't any. I asked if he had any money? He said, yes, lots of it. I asked him where he got it? He said his wife had been left $20,000. I asked him to go home with me. He said he would. Going along he said he must stop and get his trunk. I asked him where it was? He said in Mr. Smith's sadler shop. He stopped in and got his trunk, and went up to my house and took dinner with me. He wanted me to intercede to get him work with Mr. Howe, and said he wanted work, for he had no money, nothing to eat, and nowhere to stop. I told him he might stop with me, and he was very much gratified for it. I then had him washed, and shaved, and dressed, and we went down to Howe's store. I spoke to Mr. Howe for him, who didn't give him much encouragement. He said he was bound to work for Mr. Howe, for he was the best man he ever worked for. Soon after we left Mr. Howe's, he asked me if I knew where they shipped whalemen? I told him I didn't. He then asked me if the California guards had gone from Albany; that he was bound to go somewhere out of sight and hearing of his wife. That was the first allusion he had made to his wife. I asked him where he had left her? He said in New York, at one Mr. Higgin's. I asked him if he intended to live with her again? He began to cry, and said he had tried it long enough. He kept a crying, and said, 'that woman has ruined me.'

"I asked him where he had tried to live with her since he had been gone? He said, in New York, Boston, and Portland. I asked him what she had done since they had been gone? He said Portland was the place she done the business. I asked what? He said he had a fine situation there, was about buying a house and lot, and had engaged to take it, and he had caught her in some of her d—d rascally tricks. I asked what that was? He said he caught her with another man in his own room where he boarded. We then went back and got our tea.

The People v. Calvin Russ.

" At the tea table he sat with his head on his hands, with his eyes cast down. I asked him what was the matter? He turned around with a wild look, and said, ' did you say that Mr. Howe will give me work to-morrow ?' I made no reply, because he immediately got up from the table, and went out of doors without his hat, into the yard in front of the house. I followed him, and asked him where he was going? He said he was going to find her. I asked him who? and he gave me no answer. I led him back to the house, where he sat down and smoked a pipe. He complained that he had a pain in his head, and had had for three weeks. I asked what occasioned it? Ah! said he, she has ruined me, she has ruined me. I asked him if he wouldn't like to go to bed? He said he would, and I showed him to bed.

" The next morning he got up and ate a hearty breakfast. The next day, in the P. M., saw him again; he wanted me to help him get work at Troy. I gave him $2.00 to go up there. I saw him again the next day, met him in the street. Asked him where he staid the previous night? He said he didn't know. On Monday, the 24th of August, saw him again, and he looked wilder than any time I had seen him. He then began wringing his hands, and looking all around, said he had no friends, no money, and no place to go to, and he had a mind to go and jump overboard. He said his shoes were all off his feet, and he was almost discouraged trying to do any thing. I encouraged him, took him down to an acquaintance of mine who gave him a pair of shoes. I stopped a moment, and R. went along up the street; when I overtook him he was looking straight up. I tapped him on the shoulder, and he said, 'it ain't me.' I took him by the arm, and told him I wanted him to go with me, I had something to tell him. He drew back and asked what I was going to do with him? He hadn't been doing any thing. He then looked at me and said, Oh! its you George? I'll go with you. I asked him, if I got him work, if he would come and board with me, and stay with me all the time. He said he would. I then took him up to Mr. Howe's shop, and he hired him.

R. was then very mild. He was very much pleased; that noon he went up to my house and boarded with me. I took him to my house to board, because I saw that he was not right in his mind, and he was dirty and ragged. He was very regular for three or four days, after this; saw nothing out of the way. On the third day at dinner, he sat with his elbows on the table and his head upon his hands. I asked what was the matter? He sighed, and said he had a letter from his wife, that she was very sick, and wanted to know how he got along. Said he was going to write her next day. The next day he did not come home to dinner, because he said he wasn't hungry. Asked him if he had written to his wife. He gave me no answer. He appeared this day wild and restless.

"The next day he sat at the table, the same way.

"My wife asked him three times if he would have some coffee, and he paid no attention to her, but turned to me with a wild look, and asked if I spoke to him? I said no, it was my wife, and he then took some coffee and merely tasted of it, pushed his plate and cup as far as he could on to the table, and jumped from his chair, and ran out of the house bareheaded, as hard as he could run. He ran out to the front gate, came back into the house, and asked if I was ready to go to the shop. I told him I thought he had gone. He answered me with a wild look, 'Why, d—n it, I've been waiting here for you this two hours.' We went down toward our shops, and he said he was going to New York to see his wife. He didn't know what she was doing there: if she was sick, it were his duty to take care of her. She was his lawful wife, and as long as he had a cent he would take care of her.

"He was then quite regular for several days, till he told me he had another letter from her, that she had written that she was down sick, and had to put out the shirts she was making for him; that she was not able to come to Albany, and had no money to bring her. I tried to persuade him not to go nigh her at all. He asked me the reason. I mentioned the expense. He agreed with me, began to wring his hands, and

The People v. Calvin Russ.

said, 'd—n her, I'll not go nigh her again. She has used me like a rascal.'

"Saw nothing out of the way again, till the Saturday before he came to New York. He came into my shop, and said he was going to New York; if his wife was sick he must go and try and help her. Paris and his wife also told him not to go — but he said he was bound to go. He was restless, and his eyes looked very unnatural. He wanted me to go to the boat with him, and, instead of leading him down to the boat, I led him the other way round the block. While walking, he spoke of his wife, and how he loved her, and he couldn't be happy, to be there, and know she was in New York sick. He cried. He started suddenly, and said, 'd—n it, there is a steamboat just going out,' and he started and ran. There were canal-boats in the basin, but no steamboat. I ran after him, and caught him within four feet of the dock. There was a canal-boat which lay about ten feet from the dock. He got away from me, and ran to State street. He then started, and ran down to another canal-boat, and swore he could get on board that steamboat. The boats had all then left for New York. I led him across the bridge to where the steamboats were. Six or eight of them stood here, and I told him if he wanted to go to New York, there were steamboats. He swore there were no steamboats there. He started to run back over the bridge. I ran after him, and caught him, caught him up and put him into a vacant oyster house there. He then became exhausted, and sat there about fifteen minutes. Didn't speak. Of a sudden he jumped up, and I asked him if he was going to New York? He said, no, not after no such woman as that. Then he asked me, 'come, will you go down with me?' 'Go where?' 'To New York.' 'No, there is no chance to go to New York to-night.' He said he was bound to go, and could skate there. Asked me if I would lend him my skates. I led him back to the corner of Dean and State streets. He began crying, and wringing his hands, saying, why can't you let me go to New York? If I don't go they'll have me. At that moment he saw a female going

across the street, and he said, ' there she goes now, I knew she was in Albany.' He went on after her, and followed her into a house. A man came out, and asked what he wanted? He said, 'I want her.' ' Who do you want?' 'It's my wife.' ' Your wife ain't here,' and the man made him clear out. We returned to Paris's, where they asked him if he was going to New York? He said he wasn't going at all. He saw a young man there, and asked me if I knew him? I said no. He called me out doors, and asked me again, and then said, that he knew his wife was in Paris' house, and that the young man, Paris, and I, had conspired to get his wife away, and offered to bet $50.00, if they went back there, they wouldn't find the young man there, because he had gone up stairs with his wife. Went back; found the young man sitting there.

" I then took him by the arm, and led him to near the Capitol park, trying to persuade him to go home with me. He abused me a good deal. Said I wanted to rob him of his money, and go to New York and see his wife. I tried a long time to persuade him, but he wouldn't go with me, and I left him. The next morning I saw him again. He came to my house. He was then boarding with me. When he first saw me he said, 'Hallo! you got back again?' I asked, ' back from where?' He said, ' New York.' I asked him where he stopped the last night. He said he didn't know. Had the same wild look and restless appearance. I asked him if he had had breakfast. He said, yes. He than ran out of the house without his hat, and ran to State street, as far as from here to the Museum. He came back into the house rubbing his hands. I asked him where he had been. He said that he saw her and was going after her. There was no female in sight. I asked him to see who? and he said his wife. He sat down, ate a hearty breakfast, and I saw nothing more out of the way all day, nor till Tuesday P. M., when he came to my shop and told me he was going to New York. I asked him what started him so sudden? He said he had got a letter from his wife, who was dying. At his request I walked out with him. We went to the Paris — he entering, laughing

The People v. Calvin Russ.

and clapping his hands, saying he was going to New York. Changed hats with me, asked the people which he looked best in, because he was going to see his wife, and wanted to look first rate. He tried on every man's hat in the bar room, and would walk up to the glass and laugh.

"When he first came to board with me he said it cost him a good deal to get shaved, and he wanted me to teach him to shave himself. I showed him, and in a short time he got so that he could shave himself, and he borrowed of me a razor which just suited his beard. He kept it a little over a week. On the Sunday prior to his coming to New York he cut himself shaving and said, 'd—n the razor, I didn't want it, it isn't heavy enough for my beard,' and threw it down on the table. I took it up and finished shaving him. He said that when he went to New York he would get him some good shaving tools, because that razor. wasn't good enough, and a strop which he had bought at auction was nothing but paper.

"At none of the times I have been speaking of was he under the influence of liquor. I never saw him excited with liquor in my life."

He accordingly went to New York, and found the house where she had written him that she was. He found her in bed, in a miserable, destitute condition, occupying alone a small room in the attic of a tenement house, near the "Five Points" *— the only furniture of which was a bed of rags and straw on the floor, and an old bureau and her trunk. Their meeting was kind, for their room was so situated that all that took place in it could be heard by the occupants of an adjoining room. The first thing he had to do was to go out and buy some laudanum and gin for her, to enable her to get up. He then bought something for breakfast, which she got a woman in a neighboring room to cook for them. After breakfast he remained with her almost all day, telling her that he intended taking her to Albany with him that afternoon, in the steamboat, which sailed at 7 o'clock.

---

* Such was the name by which was known a part of the city, where the most profligate of the population lived and herded together in great numbers.

At about 6 o'clock, one of the women who lived in the house sent her daughter up to invite the prisoner and his wife to take tea with her.. The little girl found him lying on the bed and his wife sitting on the trunk near him. He accepted the invitation, bluntly, and the little girl returned down stairs to her mother's room.

No unkind words had been heard to pass between them during the whole day.

In about ten minutes after the invitation had been given, he went down stairs, and, instead of stopping at the room where he had been invited to take tea, he went out into the street.

The woman then sent up her daughter again to invite Mrs. Russ to come down. The girl returned immediately, in great alarm, saying that Mrs. Russ was lying on the floor, covered with blood, and she believed she was dead. Upon examination, it was found that she was dead, and it appeared that he had taken the back hair of her head in his left hand and with his right had, with a razor, cut her throat, severing both arteries and reaching down to the bone.

He was not seen again until the next day, when he was encountered in the street in the vicinity, wandering about in a listless, absent-minded manner. On searching him his hands and clothes were bloody, and there was found in his pocket a razor that was bloody and its edge blunted, as if it had been struck against a bone.

He remained in prison about four months before his trial came on, and in answer to the defense of insanity, set up by his counsel, the physician and other officers of the prison, and some of its inmates, testified to his perfect sanity during the whole time of his imprisonment; so that if he had been insane at the time of and previous to the homicide, he had been restored to his right mind immediately, or very soon after the act.

*The Judge* charged the jury:

That there was no question about the killing, and by the prisoner, and if they found that that had been the result of

intemperance or passion they would convict him, but if it was the result of insanity they would acquit him.

But it did not necessarily follow that, on the acquittal of a deranged man, he was to be turned loose upon the community to endanger its peace or safety by some other deed of violence and bloodshed. The law had wisely provided in such a case that the party should be committed to a lunatic asylum, there to remain for life, or until reason had resumed its sway and expelled all illusions from the mind.

It was necessary to bear this in mind, because there was a very general prejudice against the defense of insanity, from a fear that personal safety might thus be endangered.

Then, again, they must bear in mind the difficulty alike of making out and of defending against the allegation of insanity.

While, on the one hand, it was painful to see the punishments of crime inflicted on those whom God had already afflicted with the most distressing disease known to humanity, so on the other it was revolting to behold the real murderer or felon turned loose upon the world, upon a false pretense of disease, or from seeing it seized upon as an excuse for an unwarrantable acquittal.

The statistics of crime showed that it was much more frequent in our courts of justice to convict the really insane than it was to acquit real criminals on a false pretense of insanity.

And there was no language known, either in the law or in science, that could so clearly and precisely define insanity that its presence or absence could be certainly ascertained, for it was one of the most difficult things in the world to tell where sanity ends or insanity begins, or how much they can sit down together side by side in the mind, nor when may occur or how long continue a lucid interval, either from the entire extinction of the disease, or a mere temporary slumbering in its permanent abode.

All these considerations would go to show to the jury how difficult was their task in all cases of this character. But the court did not overlook an additional difficulty peculiar to this case.

During all the time which had elapsed since the homicide, there had been little or no evidence of insanity. Indeed, had the case stood upon this evidence alone, there could have been no difficulty in declaring the prisoner to be in his right mind. So, on the other hand, if the condition of the prisoner, as it had been proved to be for the same length of time before the act, had continued afterwards, there would be no difficulty in believing him to be unsound.

So that, to acquit the prisoner on the ground of insanity, the jury must find his mind to have been unsound up to and including the very moment of doing the act, and that almost immediately, and certainly within a very short time after it, his mind was restored to its soundness. Or, in other words, that the act done, of itself cured the disease from which it had flowed and in which had been its origin.

Now, this was not impossible. It might indeed be so, and it was for the jury to say whether in fact it was so. And in regard to this, there was one consideration which would aid them in performing their responsible duty, and that was, that there was no well grounded pretense that the badges of insanity which had been proved in the case had been fabricated. The conduct and the emotions described were undoubtedly real and genuine, and therefore the question was narrowed down simply to this, were such conduct and emotions, out of which the homicide had flowed, the result of jealous and violent passion, or of the disease of mental aberration?

The verdict was guilty, and the prisoner was sentenced to be executed.

Immediately after the trial I received from one of the counsel for the prisoner the letter which follows, and in February following I wrote to the Hon. John Stanton Gould, member of the assembly from Columbia county, the letter, a copy of which I annex.

The result was, that the execution of the prisoner was dispensed with, and he was committed to the State Lunatic Asylum.

The People v. Calvin Russ.

NEW YORK, January 18, 1847.

Hon. JOHN W. EDMONDS,

DEAR SIR: You will, I am sure, not be surprised to learn that an immediate application is about to be made to the Governor, for the interposition of the power of pardon in the case of Calvin Russ. I speak for myself and my associates when I say, that, although our mere professional duty has been so discharged as to have received the approbation of our own consciences, we yet feel that we have a still higher duty to perform, as citizens, in presenting the case to the consideration of the Executive, and in urging, by every honorable means in our power, the exercise of his prerogative in favor of our unhappy client. In this effort, we think we cannot be mistaken in anticipating your sincere and cordial co-operation, and that of your associates upon the bench. In presenting the case to the jury, you no doubt felt it to be your duty to express no opinion of your own upon the facts; but it is, of course, nevertheless true, that you could not but have entertained such an opinion; and we are much deceived in our appreciation of the force of the testimony, if that opinion, when expressed, will not be found to be in accordance with our own. Looking as we cannot but do at the conclusiveness with which the insanity of the prisoner was established by testimony, which, in your opinion, as expressed to the jury, was entitled to full credit — looking at the unanimous medical opinion which was given by men of the highest eminence in that peculiar branch of the profession — an opinion not merely of the former but of the present insanity of the prisoner, based upon the evidence of the prosecution itself and upon a personal observation of the prisoner — and looking at the cir-, cumstances of the homicide as consistent with, if not corroborative of that testimony, we feel convinced that the verdict can only be sustained by a very subtle speculation as to the probable state of mind of the prisoner, at the instant of the commission of the homicide. We are far from intending to question the purity of the motives of the jury, but the correctness of their conclusion is a matter of which we have a right to speak — and in speaking of it as unwarranted by the evidence, we think we can confidently appeal to you to sustain us.

I, therefore, beg to ask of you to furnish me with an expression of your opinion upon the case at your earliest convenience, and also to forward to the Governor your official report at as early a day as practicable.

I had intended to be present at the pronouncing of the sentence, but was unavoidably detained until a few minutes after it was delivered. I cannot but infer, however, from the entire omission on your part to express, either directly or indirectly, any approval of the verdict, that you did not feel disposed to give your personal or official sanction to a result of which I do not doubt you wholly disapproved.

I have the honor to be, dear sir,

Your very obedient servant,

DAVID GRAHAM.

NEW YORK, February 18, 1847.

DEAR SIR: During January, and about five weeks since, a man was convicted before me of murder, and I sentenced him to be executed on the 12th of March. The circumstances attending his case have given me a good deal of anxiety, and I have been daily in the hope of hearing from the Governor on the subject.

I hastened to transmit to him my report, that he might receive it before the judges of the Supreme Court should leave Albany, so as to afford him an opportunity, in compliance with the statute, of laying the case before them, and I suggested to him in my report my doubts as to the propriety of allowing the convict to be executed. This I did in order to call his early attention to the case.

I proposed to him, also, that I would cause the prisoner to be carefully regarded in the meantime, with his permission, so as to endeavor to ascertain whether his insanity existed or yet continued.

Contrary to my expectations, some five weeks have elapsed without my hearing from the Governor, even so much as to know whether my report has been received by him, and, as the time of execution is rapidly drawing nigh, I do not feel that I should be justified in permitting any feeling of

The People v. Calvin Russ.

courtesy any longer to keep me silent, and as I know your feelings on such subjects, I take the liberty of addressing you, in the confident expectation that it will receive from you prompt attention.

The defense set up for the prisoner was insanity, and, though the jury found a verdict against the plea, I have never been satisfied that he was not insane. On the other hand, my doubts have been so strong that I have not been able to overcome the dread I have, that an insane man may be executed. Therefore it was that I hastened to call the Governor's attention to the case, and hence it was that I offered to him to give the matter my attention after his condemnation.

The statute has so entirely withdrawn from me all control over the case, after conviction, and has so exclusively devolved it upon the Governor, that I have no right to interfere in it. Yet, my doubts of the propriety of an execution are so strong that I cannot be silent.

I cannot, after my offer to the Governor, and the manner in which it has been received, venture again to address him, lest I should be charged with impertinently interfering with his duty.

But, as an old friend, I address you, in the hope that you will so far interest yourself in the case, as to ascertain from the Governor whether my report has been received by him, and what measures have been taken to ascertain the continuance of the prisoner's insanity; so that, if nothing has been done, an application may be made to the Legislature to respite the sentence, till that question can be finally and satisfactorily determined.

It could have been ascertained during the four or five weeks that have elapsed since the sentence, or, at all events, much could have been done towards it; but, as that time has now passed away without any such effort, it may be advisable, if the Governor should decline to interfere, for the Legislature so far to interfere as to afford an opportunity of ascertaining whether the insanity does now exist. For what can be more revolting than the execution of a man too deficient in intellect to understand the quality of the act he has committed, or to appreciate the consequences which flow to him from it?

May I ask of you the favor of your earliest attention to this matter? I make no apology for troubling you other than what may be found in your own feelings on the subject.

Very truly yours,

J. W. EDMONDS.

Hon. J. S. GOULD.